(A.R.D. 120)

UNITED STATES *v*. AMERICAN EXPRESS CO.

Entry No. 739086.

## Third Division, Appellate Term

(Decided March 11, 1960)

*George Cochran Doub*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the appellant.

*Sharretts, Paley & Carter* (*Howard Clare Carter* and *Richard F. Weeks* of counsel) for the appellee.

Before JOHNSON, DONLON, and RICHARDSON, Judges

RICHARDSON, Judge: This is an application for review of the decision and judgment of the trial court, reported as *American Express Co.* v. *United States*, 40 Cust. Ct. 704, Reap. Dec. 9086.

The merchandise involved consists of matrix board in sheets measuring 16 or 20 by 24 inches, by 0.65 or 0.80 millimeter. It was purchased from the manufacturer and exporter thereof, Max Nitzsche & Co. AG Papierund Pappenfabrik, Obercarsdorf Bez. Dresden, and exported from Germany October 3, 1934. The matrix board was entered at the port of New York at the invoice price of reichsmark 0.60 (60 pfennigs) per square meter, net packed, and was appraised by the appraiser at reichsmark 0.80 (80 pfennigs) per square meter, less 3 per centum, packed, apparently on the basis of foreign value,

as that value is defined in 19 U.S.C.A., section 1402(c) (§ 402(c), Tariff Act of 1930), as originally enacted.[1]

On appeal to reappraisement, the trial court held that there was no foreign value for merchandise such as or similar to that in issue and found the dutiable value of the matrix board to be reichsmark 0.60 per square meter, representing the export value, as defined in 19 U.S.C.A., section 1402(d) (§ 402(d), Tariff Act of 1930),[2] as predicated upon the price of similar merchandise.

It is the position of the appellant (defendant below) that the trial court should have affirmed the value found by the appraiser. Appellant contends that the importer has neither proven the nonexistence of a foreign value for such merchandise nor established the existence of an export value, and that the decision and judgment of the trial court reappraising the merchandise upon the basis of export value as predicated upon the price of similar merchandise are not supported by the evidence and are contrary to the views of the Court of Customs and Patent Appeals in the case of *Brooks Paper Company* v. *United States*, 40 C.C.P.A. (Customs) 38, C.A.D. 495, wherein merchandise concededly in all respects similar to the merchandise in the instant case and appraised by the appraiser at the same value was the subject of reappraisement proceedings.

In the *Brooks Paper Company* case, it was the contention of the importer that 60 pfennigs per square meter represented the statutory foreign and export values of the merchandise. The trial court sustained the importer's contention and appraised the merchandise on the basis of foreign value at 80 pfennigs per square meter, less 25 per centum, less 3 per centum, packed, and found that similar merchandise was freely offered to all purchasers in Germany for exportation to the United States at the same price. *Brooks Paper Company* v. *United States*, 23 Cust. Ct. 277, Reap. Dec. 7739. The appellate division of the Customs Court reversed the judgment of the trial court and remanded the case with instructions that the appeal be dismissed. *United States* v. *Brooks Paper Co.*, 26 Cust. Ct. 596, Reap. Dec. 7975.

---

[1] [19 U.S.C.A., § 1402(c)]. FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

[2] [19 U.S.C.A., § 1402(d)]. EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The judgment of the appellate division was affirmed by the Court of Customs and Patent Appeals upon the ground that usual wholesale quantities, an essential element of foreign and export values, had not been established by competent proof and, therefore, the plaintiff had not established every element necessary for the court to make a valid appraisement. As a result, the valuation of 80 pfennigs per square meter, less 3 per centum, packed, set by the appraiser, remained in effect.

Counsel for appellant urges that the decision and judgment in the *Brooks Paper Company* case, *supra*, are *res adjudicata*, estopping the importer from litigating the issue with respect to the value of the merchandise in the instant case. In support of this proposition, counsel cites the case of *Joseph Fischer* v. *United States*, 38 C.C.P.A. (Customs) 143, C.A.D. 452, in which the principle of *res adjudicata* was held to bar further litigation with regard to the validity of the specific appraisements of importations of merchandise which had been the subject of prior judicial proceedings, wherein that issue had been determined. Appellee contends that the holding of the Court of Customs and Patent Appeals in the case of *United States* v. *Ralph Boone*, 38 C.C.P.A. (Customs) 89, C.A.D. 445, militates against appellant's argument. We fail to see that the case of *Joseph Fischer* v. *United States*, *supra*, is authority for the application of the doctrine of *res adjudicata* to the facts before us. The importation involved in the instant case is not the identical importation that was the subject of the decision and judgment in the *Brooks Paper Company* case, *supra*, and our research has not brought to light any case where a judgment in a reappraisement decision rendered with regard to one importation has been held to be *res adjudicata* and a bar to a subsequent suit involving another importation of the same merchandise by the same importer. The case of *United States* v. *Ralph Boone*, *supra*, relied on by appellee, and the case of *United States* v. *Stone & Downer Company*, 274 U.S. 225, referred to in the opinion of the appellate court, hold that the doctrine of *res adjudicata* is not applicable in cases involving the classification of imported merchandise, which, of course, is not the issue here. However, it is our opinion that the doctrine has no applicability in the instant case involving reappraisement, and we shall now proceed to a consideration of the merits.

Appellee contends, and, as we have stated, the trial court found, that there was no statutory foreign value for such or similar merchandise. It is necessary, therefore, to determine whether the nonexistence of a foreign value has been established.

The only evidence in the record relative to foreign value is to be found in a written report of Treasury Agent Kruszewski, dated January 21, 1935, and in the oral testimony of the same agent. The

written report was in evidence as defendant's exhibit A in the *Brooks Paper Company* case, *supra*, and was incorporated in the instant record by stipulation of the parties. It was made in connection with an investigation conducted by the Treasury agent in Germany relative to the foreign and export values of the matrix board covered by the involved consular invoice.

According to the information set forth in the report under the heading of "FOREIGN VALUE," inland prices for fine cardboard, including matrix board, were fixed and published by an association or cartel, and the manufacturers were required to adhere to the prices so fixed when selling their products to dealers and consumers in Germany. In consideration for signing a certificate pledging that they would not underbid the minimum prices, delivery, and payment terms set by the association, dealers were allowed a discount of 15 per centum from list prices. Consumers were charged the list prices. Attached to the report are a copy of the pricelist for matrix board (exhibit A) and a copy of the pledge certificate (exhibit B), referred to therein. These documents and the translations thereof by Customs Agent Hermes were admitted in evidence as plaintiff's collective exhibit 4 over the objection of appellant that they are hearsay. We are of the opinion that collective exhibit 4 was properly admitted in evidence by the trial court. See: 19 U.S.C.A., section 1501 (now 28 U.S.C.A., section 2633). The documents composing the exhibit were attached to and submitted with the report as a part thereof and were incorporated in the report by reference.

The oral testimony given by the Treasury agent corroborated and supplemented his written report. The gist of his testimony was that he visited the offices of the manufacturing and exporting firm, consulted the manager, Mr. Lehmann, and examined pertinent records. From Mr. Lehmann, he learned of the existence of the association or cartel and, subsequently, visited the offices of the association. There, he inspected sales records relative to sales of matrix board for home consumption and copied therefrom. He received the documents comprising plaintiff's collective exhibit 4. He found that the prices at which matrix board was sold did not vary with the quantity purchased but depended upon the category of the purchaser, and that sales of matrix board were made to two classes of purchasers only, namely, dealers and consumers. During the course of the witness' testimony with respect to sales of matrix board in Germany, counsel for the parties orally stipulated that "the price at which matrix board was sold did not vary with the quantity in which it was sold." (R. 35.)

The trial court accepted the foregoing evidence and based findings of fact thereon. Appellant assigns these findings as error on the ground that there is no competent evidence in the record to support

them. It is claimed that the entire testimony of the Agent Kruszewski is hearsay and should not have been admitted by the trial court over the objection of the appellant. It is further claimed that the testimony of the agent reveals that the statements contained in his written report have their basis in hearsay and that, consequently, the report should be accorded no evidentiary weight.

We do not think that the testimony as to facts learned by a duly authorized Treasury agent in the course of an official investigation in connection with the value of imported merchandise is incompetent as hearsay, because his knowledge of such facts was learned through interviews with persons having a personal knowledge thereof, and from examinations of regular books of account and other pertinent records of the manufacturer and exporter of the involved merchandise, and of the trade association which fixed the prices and conditions governing the sale of the merchandise for home consumption. In such an investigation, much of the information must, of necessity, be acquired in this manner, and the investigating agent's testimony with regard thereto is admissible as evidence to be weighed by the court.

The knowledge of the facts testified to by the agent was acquired in the line of official duty and, in our opinion, the situation is somewhat analogous to that of an officer or employee testifying to facts learned in the course of employment. With respect to such testimony, the court, in the case of *Transcontinental Petroleum Co.* v. *Interocean Oil Co.*, 262 F. 278, made the following statement:

> Much of what officials of large enterprises know of their operation is necessarily learned "in the course of business" and from associates and employes, through conferences, conversations, letters, reports, records, and the like. It is upon such information that the business is directed and carried on. Considered narrowly and technically it might be regarded as proceeding in considerable measure from hearsay, but absolute, first-hand, personal knowledge is not as a rule practicable and is not required as an invariable rule of evidence. As Lord Ellenborough said, "the rules of evidence must expand according to the exigencies of society." Pritt v. Fariclough, 3 Campbell, 306. Cross-examination into the scope of the jurisdiction and duties of the officials and the sources and extent of their information may affect the weight of their testimony.

Nothing was brought out on cross-examination in this case which, in our opinion, affects the probative value of the testimony or the report, and we find nothing elsewhere in the record which in any way reflects adversely on the truth or accuracy of the facts contained therein. The Treasury agent was experienced, he was a disinterested party, the facts testified to and reported by him were gathered during an investigation made on behalf of the opposing party, and have not been contradicted. Therefore, there was in the record competent evidence to support the trial court's findings of facts based thereon.

We think the trial court was correct in concluding on the basis of the facts of record that there was no foreign value for such or similar merchandise. Foreign value, as defined in section 1402 (c), *supra*, contemplates a single price at which merchandise is offered for sale to all purchasers within the requirements of the statute. See *United States* v. *M. V. Jenkins et al.*, 26 Cust. Ct. 467, Reap. Dec. 7924, affirmed in *United States* v. *M. V. Jenkins et al.*, 39 C.C.P.A. (Customs) 158, C.A.D. 479. Where, as in the instant case, the evidence establishes that merchandise such as or similar to that in issue was offered for sale for home consumption at differing prices which did not vary with the quantities sold, but were based upon the category of the purchaser, there was no single price at which such or similar merchandise was freely offered for sale to *all* purchasers and, consequently, there was no foreign value within the meaning of the statute. See *United States* v. *Glanson Co.*, 43 Cust. Ct. 601, A.R.D. 110, now on appeal.

Foreign value as statutorily defined also contemplates a free offering of the merchandise. According to the evidence, dealers were offered matrix board at a discount from the association's list price coupled with a requirement that they sign a pledge which, in effect, imposed restrictions upon resale by the dealers of the merchandise in the home market. A foreign market is restricted when restrictions are imposed upon the resale of merchandise, *United States* v. *Graham & Zenger, Inc.*, 31 C.C.P.A. (Customs) 131, 135, C.A.D. 262; *M. V. Jenkins et al.* v. *United States*, 34 C.C.P.A. (Customs) 33, C.A.D. 341; and foreign value cannot be found on the basis of inland sales in a restricted market. *United States* v. *Half Moon Mfg. & Trading Co., Inc.*, 28 C.C.P.A. (Customs) 1, C.A.D. 115.

Since there was no foreign value for the merchandise, as that value is provided for in section 1402 (c), *supra*, and since it is not disputed that the Brooks Paper Company had the exclusive right to sell the Nitzsche product in the United States and, consequently, there could be no export value for such merchandise, it remains to be determined whether there is an export value for similar merchandise, as appellee contends.

With respect to the question of export value, there is in evidence on behalf of appellee as plaintiff's collective exhibit 2 a portion of the testimony given at the trial in the case of *Brooks Paper Company* v. *United States, supra*, by the late Everett L. Brooks, president of the Brooks Paper Company, the ultimate consignee of the instant merchandise. According to the testimony of Mr. Brooks, he purchased matrix board imported by his firm and, in this connection, visited Germany from 1924 to and including 1932. The price agreed upon by Brooks Paper Company and Max Nitzsche & Co. for matrix board like that in the instant case during the period between 1934 and

1940, which period covers the date of exportation of the involved matrix board, was 52 pfennigs per square meter, and the witness did not recall ever having paid more for the Nitzsche product during those years. The Brooks Paper Company received written offers of sale of matrix board from other manufacturers in Germany during this period, three of whom were identified as N. Geissler of the firm of Halberstadter Papier-Und Pappen Fabriken; Clemens Claus, and Rudolf Schmidtchen. Geissler quoted a price of 47 pfennigs and Claus and Schmidtchen quoted a price of 60 pfennigs per square meter for matrix board of the same thickness as that involved. Samples were submitted with the offers. Mr. Brooks personally examined the samples, and tested them for uniformity of quality of finish, thickness, bending properties, and reaction to hot metal. He found these samples to be commercially interchangeable with plaintiff's exhibit 1, which is a sample of the involved matrix board. He stated that the quality of the sample submitted by Claus was commercially identical with plaintiff's exhibit 1, but that he had never purchased any of the Claus matrix board because Nitzsche & Co. was selling his firm equal quality at a lower price. According to Mr. Brooks, the Schmidtchen matrix board was of a better quality than the Nitzsche product, and his firm purchased a substantial amount of matrix board like plaintiff's exhibit 1 from Schmidtchen at a price of 60 pfennigs per square meter during the years 1934 to 1940. Mr. Brooks did not recall ever paying any manufacturer more than 60 pfennigs per square meter for matrix board of the same thickness of plaintiff's exhibit 1. It was admitted that prices of matrix board in Germany remained constant during that period. There were no restrictions either as to exclusive representations, quantities required to be purchased, or on the resale of the merchandise in connection with any of the written offers of sale or the purchases from Schmidtchen. A group of invoices was offered and received as corroborative evidence of purchases of matrix board by the Brooks Paper Company from Rudolf Schmidtchen. The written offers of sale are in evidence as part of the testimony of Mr. Brooks (collective exhibit 2).

It is our opinion that the facts testified to by Mr. Brooks and corroborated in part by documentary evidence not only prove the existence of an export value for merchandise similar to that in issue, but what that export value is. The record shows that the matrix board which was the subject of the Claus and Schmidtchen quotations as represented by samples submitted therewith are of *approximately* the same price as the merchandise in issue, are adapted to the same use, may be substituted therefor, and, in fact, are commercially interchangeable with the instant matrix board. Mr. Brooks' testimony with regard to the commercial interchangeability of the Claus and Schmidtchen

products was neither objected to nor contradicted, and his opinion in this respect is entitled to consideration. *United States* v. *The American Bluefriesveem, Inc. (Van Houten Co.)*, 22 C.C.P.A. (Customs) 67, T.D. 47063. The similarity of the compared products does not appear to be disputed by counsel for appellant and their similarity for appraisement purposes is thus established.

It is apparent from the record that this "similar" merchandise was offered for sale under circumstances that accord with a free offering to the importer herein for exportation to the United States at prices that did not exceed 60 pfennigs per square meter, regardless of the quantity purchased. These free offerings were made by more than one manufacturer of matrix board, and we think it reasonable and legitimate to infer from the established facts that the merchandise was offered for sale under the same terms and at the same prices to all who cared to buy for export to the United States. There is nothing in the record that in any way indicates that the offers from Claus or Schmidtchen were sporadic or restricted to the Brooks Paper Company, as appellant suggests.

Appellant contends that appellee has not established the usual wholesale quantities in which the matrix board was sold and, therefore, has not met every material issue necessary for a valid appraisement, citing *Brooks Paper Company* v. *United States* (C.A.D. 495), *supra*. "The purpose of determining the *usual* wholesale quantities under section 402 is to ascertain the proper valuation of the imported merchandise." [Italics quoted.] *United States* v. *Fisher Scientific Company*, 40 C.C.P.A. (Customs) 164, 169, C.A.D. 513. Where, as in the instant case, the imported merchandise is offered for sale at a price *in any quantity*, there are no ascertainable usual wholesale quantities which can have an effect upon the valuation of the merchandise under section 1402, *supra*, and, for this reason, the question of usual wholesale quantities does not seem to be a relevant and *material* issue in the present case, thus eliminating the necessity of proof of such quantities. *United States* v. *Antique Import Co.*, 40 Cust. Ct. 868, A.R.D. 83.

On the record presented, we find as facts:

1. That the merchandise covered by this appeal for reappraisement consists of matrix board in sheets measuring 16 or 20 by 24 inches, by 0.65 or 0.80 millimeter.

2. That, at or about the date of exportation of said merchandise, sales of such and similar merchandise were made in the country of exportation for home consumption to only two classes of purchasers, to wit, dealers and consumers.

3. That an association or cartel fixed the prices and conditions under which manufacturers of matrix board sold their products for home consumption in Germany.

4. That the price at which such sales were made was not affected by the quantities sold, but depended solely upon the category of the purchaser.

5. That dealers received a discount of 15 per centum from the association's list price, provided they signed a pledge not to underbid the association's minimum prices, delivery, and payment terms.

6. That the ultimate consignee was the exclusive sales agent of the German manufacturer and exporter of the instant merchandise.

7. That merchandise similar to the instant merchandise was freely offered for sale to all purchasers for exportation to the United States at prices which did not exceed 60 pfennigs (reichsmark 0.60) per square meter, without regard to quantities purchased, and without any restrictions on resale.

We, therefore, conclude that:

1. There was no price at which such or similar merchandise was freely offered for sale to all purchasers in the country of exportation, and, therefore, there was no foreign value, as defined in 19 U.S.C.A., section 1402(c) (section 402(c) of the Tariff Act of 1930), as originally enacted.

2. That such merchandise was not freely offered for sale to all purchasers in Germany for exportation to the United States.

3. That similar merchandise was freely offered for sale to all purchasers in Germany for exportation to the United States at prices which did not exceed 60 pfennigs (reichsmark 0.60) per square meter.

4. That export value, as defined in 19 U.S.C.A., section 1402(d) (section 402(d) of the Tariff Act of 1930), as predicated upon the price of similar merchandise is the value of the merchandise at bar.

5. That such value is represented by the entered value.

The judgment of the trial court is, therefore, affirmed, and judgment will issue accordingly.